UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTONIO COOPER,

        Plaintiff,

v.

COUNTY OF WASHTENAW, and
BRIAN YEAGER,

        Defendants.
_____/

Case No: 22-10197

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [22]**

This § 1983 case stems from the detainment and arrest of Plaintiff Antonio Cooper by Defendant Brian Yeager. In his Complaint, Plaintiff alleges Yeager violated his Fourth Amendment right to be free from unreasonable search and seizure. Before the Court is Defendants' motion for summary judgment. (ECF No. 22.) Plaintiff filed a response opposing in part and concurring in part with Defendants' motion. (ECF No. 28.) Defendants filed a reply. (ECF No. 31.) The Court finds oral argument is not necessary as the facts and issues have been sufficiently presented in the parties' briefing. *See* E.D. Mich. L.R. 7.1(h). For the reasons that follow, Defendants' motion for summary judgment is granted in part and denied in part.

**I.    Background**

Early in the morning on January 23, 2020, an individual was stabbed on the front porch of 645 Villa Drive, a townhouse in Ypsilanti Township, Michigan. The victim was taken to the hospital and was not expected to survive. Detective Brian Yeager ("Det.

1

Yeager"), a third-year detective and thirteen year veteran with the Washtenaw County Sheriff's Office, was assigned to investigate the crime. (ECF No. 22-2, PageID.130.) He first interviewed two witnesses to the stabbing. The witnesses confirmed the location of the incident and one of them said a man named "Geo" stabbed the victim. (*Id.*) Det. Yeager next interviewed the victim at the hospital. He showed the detective the Facebook profile, including a profile picture, of the man who harmed him. (*Id.* at 144.) The victim also told Det. Yeager the suspect's name, Georgio Williams, and that the suspect lived at the townhome where the stabbing occurred. (*Id.* at 140.) Neither the victim nor the witnesses were able to tell Det. Yeager whether the suspect had fled the crime scene or if he was still there. (*Id.* at 144.)

After speaking with the victim, Det. Yeager returned to the sheriff's station to gather more information about the purported suspect. (*Id.* at 146.) He was able to pull up Georgio Williams' driver's license through the Law Enforcement Information Network. (*Id.*) From his driver's license information and the descriptions given by the victim and witnesses, Det. Yeager understood the suspect to be a 31-year-old Black male who wears his hair in dreads, stands five feet eleven inches tall, and weighs approximately 200 pounds. (*Id.* at 145, ECF No. 22-5, PageID.215.) Det. Yeager printed the photograph he obtained from the suspect's driver's license, placed it in a binder he carried with him, and made his way to the crime scene to conduct a neighborhood canvas. (ECF No. 22-2, PageID.146, 147.) He knew the suspect had not yet been located. (ECF No. 22-5, PageID.212.)

Det. Yeager arrived at the townhome complex in an unmarked vehicle approximately seven to eight hours after the stabbing had occurred. (ECF No. 22-2, PageID.147.) He was not wearing a typical sheriff's deputy uniform—his detective attire

consisted of a black winter hat, tan pants, black boots, and a plain black jacket over a black sheriff's office polo shirt. (*Id.* at 148.) His badge was clipped to his belt and was likely covered by his jacket, but he wore a lanyard around his neck that displayed his official Washtenaw County Sheriff's Office identification card on one side, and his business card with a sheriff's star and his name on the other side. (*Id.* at 148-49, 150; ECF Nos. 22-7, 22-8.) Det. Yeager began knocking on the doors of the townhomes that surrounded the same court as the townhome where the incident had occurred, but after attempting contact at fifteen or twenty residences in the complex, he had gained no additional information. (ECF No. 22-2, PageID.155, 193.) He knocked on the door of the townhome where the stabbing occurred and the suspect resided, but there was no answer, so he left his business card at the door. (*Id.* at 154.)

As he was conducting his neighborhood canvas at a residence about fifty feet away from the suspect's townhouse, Det. Yeager observed a man, later identified as Plaintiff, holding a pizza box and standing on the porch where the stabbing had occurred. (*Id.* at 155-60; ECF No. 22-5, PageID.213.) The man was Black, wore his hair in long dreads, and appeared to Det. Yeager to be the same height, weight, and age as Georgio Williams. (ECF No. 22-2, PageID.189; ECF No. 22-5, PageID.215.) Det. Yeager approached the individual, believing the man was the suspect returning home to the scene of the crime. (*Id.*)

The audio recorder Det. Yeager had in his binder picked up the ensuing conversation:

> Det. Yeager: What's going on man? Been trying to reach you all day. . . .
> Plaintiff: I just visiting. (Inaudible).
> Det. Yeager: What's your name . . . . You're Georgio, huh?

3

| | |
|---|---|
| Plaintiff: | No. |
| Det. Yeager: | No? What's your name? |
| Plaintiff: | My name's not Georgio. |
| Det. Yeager: | What's your name? |
| Plaintiff: | My name's not Georgio. |
| Det. Yeager: | I got a picture of him, you look like Georgio to me. Listen, I'm Detective Det. Yeager with the sheriff's office. |
| Plaintiff: | Listen, listen. My name's not Georgio. |
| Det. Yeager: | What is your name? |
| Plaintiff: | It's not Georgio. |
| Det. Yeager: | Are you clear what happened here today. . . . Because there was an attempt murder that happened right about where you're standing this morning, and all day we've been trying to make contact with people at this place. |
| Plaintiff: | What? It was a what? |
| Det. Yeager: | An attempt murder. |
| Plaintiff: | I don't know nothing about that. . . . |
| Det. Yeager: | So who are you coming here to see? |
| Plaintiff: | I was just coming to visit. . . . You ask me a lot of questions and I don't understand why. |
| Det. Yeager: | How come you're not telling me your name? Because you look like you match Georgio. |
| Plaintiff: | I don't usually give my name out to people I don't know. |
| Det. Yeager: | Well, I'm Detective Brian Det. Yeager with the sheriff's office investigating an attempt murder. |
| Plaintiff: | But I don't know you. |
| Det. Yeager: | So we can do this the easy way or the hard way. . . . We can take a ride down to the station and talk there, or you can clear this all up and show me your ID and I'll get you on your way. Because I've got a picture of Georgio, and you look pretty close to Georgio to me. |
| Plaintiff: | Let me see the picture. . . . |
| Det. Yeager: | How about a picture on your ID? That will clear it up. |

(ECF Nos. 22-11; 22-12, PageID.307.)

Following this exchange, Plaintiff answered a phone call and Det. Yeager used the break in conversation to call for backup. (*Id.*) While Det. Yeager was still on the call with dispatch, Plaintiff attempted to move off the porch but Det. Yeager put his hand out to

4

stop him. (*Id.*; ECF No. 28-2, PageID.554; ECF No. 22-2, PageID.176.) Plaintiff placed his hand on Det. Yeager's chest and pushed him back and out of the way as he moved past. (ECF No. 22-2, PageID.176; ECF No. 28-3, PageID.554.) Det. Yeager can be heard on the audiotape telling Plaintiff "do not!" as this was occurring, and Plaintiff is heard asking Det. Yeager "why is you touching me?" (ECF No. 22-11.)

Plaintiff then walked to his car, which was parked nearby, and Det. Yeager continued to try to stop him. (ECF No. 22-12, PageID.307.) Plaintiff states he reached for his car door handle and Det. Yeager slammed his body into the car door, closing it and pushing Plaintiff's arm off the handle. (ECF No. 28-2, PageID.553-54.) Det. Yeager again asked Plaintiff for his name, but received no answer. Instead, Plaintiff told Det. Yeager multiple times to back away from him, shouted out for witnesses nearby to record this "harassment," and called 911. (ECF No. 22-12, PageID.307-08.)

On the call with the 911 dispatcher, Plaintiff identified himself as Antonio Cooper and spelled his last name. (ECF Nos. 22-14, 22-15.) Plaintiff told the dispatcher that "a male with Army type boots" was "screaming that he's some type of sheriff with a paper ID" and attacking him. *Id.* He said he felt threatened and asked that someone be sent to help him. *Id.* The 911 dispatcher confirmed that Det. Yeager was an officer multiple times during the short call and when this did not appease Plaintiff, she let him know that other officers were on their way. *Id.*

Uniformed officers arrived at the scene while Plaintiff was on the phone with the 911 dispatcher. Plaintiff and Det. Yeager continued to argue about what had occurred and Plaintiff told the newly arrived officer that he wanted to make a police report concerning Det. Yeager's behavior. (ECF No. 22-12, PageID.308-09.) After the officer

5

told Plaintiff that he was required to identify himself to Det. Yeager, Plaintiff produced identification which confirmed his name was Antonio Cooper, not Georgio Williams. (*Id.*, PageID.309.) At the same time, he asked the additional officer for the police report paperwork so that he could leave. *Id.* Det. Yeager told him to "hang on for just a moment." *Id.*

A review of Plaintiff's identification indicated that Plaintiff was a 31-year-old Black male who stands five feet ten inches tall and weighs 215 pounds. (ECF No. 22-5, PageID.215.) After the officers reviewed Plaintiff's ID, Plaintiff was told he was under arrest for assaulting a police officer. (ECF Nos. 22-11, 22-12, PageID.310.) Plaintiff was handcuffed as Det. Yeager and the other officer continued to talk about what had occurred and agreed that Plaintiff had been "playing games." (*Id.*, PageID.311.) Plaintiff protested, arguing that he provided his identification, but Det. Yeager informed him that it was assault when Plaintiff pushed him in the chest. (*Id.*, PageID.310.) "Assaulting a police officer? Is you serious? . . . I didn't assault you, I asked you to move out my way. . . . I tried to walk away because you blocked me from getting in my car," Plaintiff responded. *Id.* "Listen," replied the additional officer, "[i]f you didn't do anything and you're innocent, you'll be let go." (ECF No. 22-12, PageID.310.)

At Det. Yeager's request, the other officer booked Plaintiff for assault on a police officer under Mich. Comp. Laws § 750.81d(1), which also prohibits obstruction or resisting arrest.[1] (*Id.*, PageID.311.) Plaintiff spent two days in jail and was tried in a bench trial before a State of Michigan district court judge. (*See* ECF Nos. 28-7, 28-8, 28-9.) After

---

[1] Mich. Comp. Laws § 750.81d(1) provides that "[A]n individual who assaults, batters, wounds, resists, obstructs, opposes, or endangers a [police officer or sheriff] who the individual knows or has reason to know is performing his or her duties is guilty of a felony . . . . 'Obtruct' includes . . . a knowing failure to comply with a lawful command."

6

reviewing the evidence, the judge noted that citizens are permitted to resist an unlawful arrest. (ECF No. 28-9, PageID.723.) She found that although Plaintiff had an "attitude" during the encounter, his arrest was unlawful under the circumstances and therefore he was not guilty of violating Michigan law. (*Id.*, PageID.723-24; *see also* ECF No. 28-14.) Six months after Plaintiff's acquittal, he filed the present lawsuit.

## II.    Legal Standard

Federal Rule of Civil Procedure 56(a) authorizes a party to move for summary judgment on any claim or defense, or part of any claim or defense. Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must "set out specific facts showing a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986).

In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor. *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986)). "If the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," the court will grant the motion. "'[S]ubstantive law will identify which facts are material," and a court will not grant summary judgment "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Anderson*, 477 U.S. at 248.

III. **Analysis**

    A.    **Constitutional Claim**

Plaintiff alleges that his Fourth Amendment rights to be free from wrongful investigation, arrest and imprisonment were violated when Det. Yeager detained him without reasonable suspicion and thereafter arrested him without probable cause. Det. Yeager disagrees with Plaintiff's assessment arguing that the totality of the circumstances gave him reasonable suspicion to conduct an investigatory stop of Plaintiff. From there, Det. Yeager claims, he had probable cause to arrest Plaintiff once Plaintiff refused to give his name or provide his identification.

The Fourth Amendment, made applicable to the States by the Fourteenth Amendment, guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Because the Fourth Amendment protects against only "unreasonable" seizures, a law enforcement officer's reasonable suspicion that a person may be involved in criminal activity permits the officer to stop the person for a brief time and take additional steps to investigate further. *See Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. Atchley*, 474 F.3d 840, 847 (6th Cir. 2007). Thus, the first question is whether Det. Yeager's decision to stop Plaintiff and question him was supported by reasonable suspicion.

To conduct an investigatory stop, or *Terry* stop, reasonable suspicion requires that an officer have more than a hunch—he must possess a particularized and objective basis for suspecting the particular person is involved in criminal activity based on specific and articulable facts. *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008) (quoting *Smoak v. Hall*, 460 F.3d 768, 778–79 (6th Cir. 2006). Officers, and courts reviewing officers' conduct

8

in light of a constitutional claim, must consider the totality of the circumstances, including both inculpatory and exculpatory evidence. *Wesley v. Campbell,* 779 F.3d 421, 429 (6th Cir. 2015).

Importantly, the officer's reasonable suspicion need not arise exclusively from his own direct observations. *Dorsey*, 517 F.3d at 395. An officer may use his "experience and specialized training to make inferences from and deductions about the cumulative information available" to support reasonable suspicion. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). This can include an officer's observations of suspicious activity, *see Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("nervous, evasive behavior is a pertinent factor in determining reasonable suspicion"); *United States v. Beauchamp*, 659 F.3d 560, 570 (6th Cir. 2011), or the location where an officer encounters an individual, *Wardlow*, 528 U.S. at 124 ("officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation"); *United States v. Hurst*, 228 F.3d 751 (6th Cir.2000) (finding that physical and temporal proximity to the scene of a crime are relevant factors in the reasonable-suspicion inquiry).

Moreover, the officer may also base his or her reasonable suspicion on information derived from other sources. *See Dorsey*, 517 F.3d at 395. This includes tips and identifications from known witnesses, which have a "high indicia of reliability" to justify reasonable suspicion for a *Terry* stop. *United States v. Craig*, 306 F. App'x 256, 260 (6th Cir. 2009); *see also United States v. Thomas*, 11 F.3d 620, 628 (6th Cir. 1993) (noting that information and identification gathered from an eyewitness supported reasonable suspicion). In short, reasonable suspicion for the identification of a suspect is lawful if based

on facts that substantially distinguish the stopped individual from the broader universe of law-abiding citizens. *See, e.g., Reid v. Georgia*, 448 U.S. 438, 441 (1980).

Here, Yeager argues that he had reasonable suspicion to detain and investigate Plaintiff because he believed Plaintiff was Georgio Williams, the suspect identified by both the victim and witnesses to the incident. Yeager articulates in his motion the visual similarities between Plaintiff and Georgio Williams, including that they shared the same or similar race (Black), age (31 years old), hairstyle (dreads), height (five feet ten or five feet eleven), and weight (200 or 215 pounds). (ECF No. 22, PageID.106-07; ECF No. 31, PageID.854.) Yeager also states that his knowledge that the suspect was on the loose, Plaintiff's location on the porch where the suspect lived and the stabbing occurred, and Plaintiff's refusal to identify himself further raised his suspicions that Plaintiff was, indeed, the person accused of the crime. (*Id.*) Thus, he argues, the totality of the circumstances gave him reasonable suspicion to detain Plaintiff and question him about the stabbing. (*Id.*, PageID.108.)

Plaintiff argues that it was unreasonable for Yeager to confuse him with Georgio Williams because, among other things, he was holding a pizza box and knocking on the front door of the townhome. Additionally, Plaintiff claims that when compared, his booking photograph from the day of the incident and the photograph of Georgio Williams that Det. Yeager carried with him look nothing alike beyond that both Plaintiff and Georgio Williams are Black males. Plaintiff states "the skin complexions are distinctly different, as is the shape of the noses, shapes of the mouths and lips, facial hair, hair length, as well as other facial features [that are distinctly different]." (ECF No. 28, PageID.528.)

10

Whether Plaintiff on the date of the incident resembled the photograph of Georgio Williams is a question best left up to the jury. *King v. United States*, 917 F.3d 409, 425 (6th Cir. 2019), *rev'd on other grounds sub nom. Brownback v. King*, 141 S. Ct. 740 (2021); *see also McKenna v. Edgell*, 617 F.3d 432, 442 n.6 (6th Cir. 2010) (discussing the unanswered question of whether the Supreme Court's holding in *Ornelas v. United States*, 517 U.S. 690 (1996), that reasonable suspicion and probable cause determinations are questions of law in the context of a motion to suppress in a criminal case, should be applied to civil §1983 suits). Nevertheless, given the similarities the men did share, *i.e.*, age, race, height, weight, and hair styled in dreads, combined with Plaintiff's location at the scene of the attempted murder and his evasiveness, the Court finds that a reasonable jury would likely conclude that Det. Yeager had reasonable suspicion to stop Plaintiff and conduct a brief investigation.

That same reasonable jury could also find, however, that any reasonable suspicion Det. Yeager initially possessed was dispelled as the situation progressed. *See Davis v. Walleman*, 596 F. Supp. 3d 877, 896 (E.D. Mich. 2022) (finding a genuine issue of material fact as to whether an officer possessed reasonable suspicion to conduct a *Terry* stop, and whether that reasonable suspicion was dispelled during the interaction with the arrestee).

"It is up to law enforcement, if they have appropriate suspicions, to investigate and confirm or dispel those suspicions." *Bennett v. City of Eastpointe*, 410 F.3d 810, 827 (6th Cir. 2005). Here, the record supports a conclusion that Det. Yeager, at some point during the encounter, stopped believing that Plaintiff was the suspect and started to believe that Plaintiff was "playing a game" with him by purposely being evasive. (ECF No. 22-12, PageID.311.) Continuing to take the totality of circumstances into account, Plaintiff's statement that he was "visiting," combined with his "fresh pizza," his knocking on the door

11

of the residence rather than simply entering, and his eventual call to 911 during which he identified himself as Antonio Cooper and stated he wanted to make a police report—all of this viewed together creates a question of fact as to whether reasonable suspicion continued to exist throughout the entire time Plaintiff was prohibited from leaving, up to and including the time of his arrest.

The Supreme Court in *Berkemer v. McCarty* instructs that a suspect must be released once an officer determines the suspect's identity and obtains information dispelling the officer's suspicions. 468 U.S. 420, 439-40 (1984). Certainly, once Plaintiff provided his identification, any question regarding Plaintiff's identity could have been resolved in Plaintiff's favor. *See Von Herbert v. City of St. Clair Shores*, 61 F. App'x 133, 136 (6th Cir. 2003) (finding that the police inquiry should have been satisfied once the arrestee produced her ID showing a different name than that of the suspect where there was no testimony concerning the validity of an arrestee's identification). Det. Yeager's conduct after that point, therefore, was likely unreasonable.

This brings the Court to its next question: If reasonable suspicion was dispelled towards the end of Det. Yeager's encounter with Plaintiff, was there probable cause for the arrest? Again, likely no.

A warrantless arrest, like the one at issue here, is reasonable under the Fourth Amendment if supported by "probable cause to believe that a criminal offense has been or is being committed." *Brooks v. Rothe*, 577 F.3d 701, 706 (6th Cir. 2009) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)). As with reasonable suspicion, probable cause depends on the totality of the circumstances and officers "cannot look only at the evidence of guilt while ignoring all exculpatory evidence." *Brown v. Knapp*, 75 F.4th 638,

12

647 (6th Cir. 2023). An officer has probable cause "only when he discovers reasonably reliable information" that an individual has committed or is committing a crime. *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000).

At the time of the incident, Det. Yeager informed Plaintiff that he was under arrest for assault on a police officer stemming from when Plaintiff came over to him and pushed him in the chest. (ECF No. 22-12, PageID.310.) He later testified that the push caused him to take a step backwards, but he did not fall or feel the need to reach out and grab onto something to keep himself from falling. (ECF No. 22-2, PageID.177.)

For purposes of ruling on Defendants' motion for summary judgment, however, it is Plaintiff's version of events the Court accepts as true. According to Plaintiff, he did not push Det. Yeager, but rather he stuck his arm out while the detective was in his vicinity. (ECF No. 28-2, PageID.554.) This testimony from Plaintiff is consistent with what can be heard on the audiotape of the encounter—Plaintiff asks Det. Yeager "why is you touching me" as he tries to walk to his car, then later protests his arrest by stating: "Assaulting a police officer? Is you serious? . . . I didn't assault you, I asked you to move out my way. . . . I tried to walk away because you blocked me from getting in my car." (ECF Nos. 22-11; 22-12, PageID.310.) Although Plaintiff was booked and charged with assaulting a police officer, the record does not suggest that Det. Yeager at any point feared for his safety or experienced actual injury resulting from physical contact with Plaintiff. Det. Yeager did not feel the need to reach for his weapon when the push occurred, (ECF No. 22-2, PageID.177), and even the additional officer who arrived on the scene seemed open to the suggestion that Plaintiff did not assault Det. Yeager, stating "[l][isten . . . [i]f you didn't do anything and you're innocent, you'll be let go." (ECF No. 22-12, PageID.310.) Consistent

13

with this evidence, the trial court found Plaintiff not guilty of the charges against him. (ECF No. 28-9, PageID.723.)

Contrary to what Plaintiff was told at the scene, Det. Yeager asserts in his motion that Plaintiff was arrested for obstruction arising from Plaintiff's refusal to provide his identification during the *Terry* stop. (ECF No. 22, PageID.110.) The same Michigan statute that outlaws assaulting a police officer also makes resisting or obstructing an officer in the course of his or her duties a felony. *See* Mich. Comp. Laws § 750.81d. Pursuant to this statute, during a lawful *Terry* stop, "an officer may request that a suspect identify him or herself, and the suspect does not have a Fourth Amendment right to refuse the request." *Davis*, 596 F. Supp. 3d at 886 (citing *Barrera v. City Mt. Pleasant*, 12 F.4th 617, 622 (6th Cir. 2021)). Accordingly, Det. Yeager states, "[a]s soon as Plaintiff refused to identify himself, Det. Yeager had probable cause to arrest Plaintiff to ascertain his identity and protect the public from a potentially dangerous criminal suspect." (ECF No. 22, PageID.109.)

While this may have been true initially, Plaintiff was not handcuffed or told he was under arrest until *after* he provided his identification to the officers. As the situation had changed at that point, Plaintiff having provided his identification and the totality of the circumstances strongly suggesting Plaintiff was not Georgio Williams, it would not be unreasonable for a jury to find probable cause for the arrest was lacking.

### B. Qualified Immunity

Det. Yeager asserts that, even if there was a constitutional violation, he is entitled to qualified immunity. (ECF No. 22, PageID.113.) "The doctrine of qualified immunity shields government officials from personal liability 'for civil damages insofar as their conduct does

14

not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Davis*, 596 F. Supp. 3d at 886 (citing *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009)). Two competing interests are balanced when considering whether qualified immunity applies: "the need to hold public officials accountable when they exercise their power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). It applies regardless of whether the government official's error is a mistake of law, mistake of fact or a combination of the two. *Ibid.*

"Once raised, it is the plaintiff's burden to show that the defendants are not entitled to qualified immunity." *Kinlin v. Kline*, 749 F.3d 573, 577 (6th Cir. 2014) (quoting *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir.2013)). To overcome qualified immunity, a plaintiff must demonstrate two things: (1) that the officer violated a constitutional right and (2) that the right was "clearly established at the time." *Baxter v. Bracey*, 751 F. App'x 869, 871 (6th Cir. 2018) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)). Clearly established is an "exacting standard," meaning that the law was so clear at the time of the incident that every reasonable officer in such a scenario would have known he was violating it. *Id.* Although the plaintiff bears the burden of production to overcome qualified immunity, the court must still view the evidence, and draw all reasonable inferences, in favor of the non-moving party. *Davis*, 596 F. Supp 3d at 886.

Contrary to many cases that discuss in detail whether a right was "clearly established" for purposes of qualified immunity, here, the law is clear and Det. Yeager's entitlement to qualified immunity turns on whether there was a violation of Plaintiff's Fourth Amendment right. Any reasonable officer is well aware of the laws that require reasonable

15

suspicion for a *Terry* stop or probable cause for a warrantless arrest. But, whether Det. Yeager had reasonable suspicion to detain Plaintiff throughout their entire encounter and probable cause to place him under arrest after he provided his identification are questions best left to a jury. It would not be unreasonable, based on the record, for a jury to find that Det. Yeager continued to detain and eventually arrested Plaintiff not based on probable cause, but instead as retaliation for Plaintiff's "attitude," as noted by the state court judge at Plaintiff's trial. (*See* ECF No. 28-9, PageID.723.) Thus, summary judgment on the basis of qualified immunity is not appropriate at this time. *See Brandenburg v. Cureton*, 882 F.2d 211, 215 (6th Cir. 1989) (citing *Poe v. Haydon,* 853 F.2d 418, 426 (6th Cir.1988)) (finding that a court may not be able to make a determination about a defendant's entitlement to qualified immunity if there are outstanding questions of material fact).

### IV. Conclusion

For the foregoing reasons, and because Plaintiff does not oppose dismissal of the claim against Washtenaw County (ECF No. 28, PageID.535), the Court GRANTS IN PART AND DENIES IN PART Defendants' Motion for Summary Judgment. (ECF No. 22.) The motion is GRANTED in that Plaintiff's claim against Washtenaw County is DISMISSED; the motion is DENIED in all other respects.

SO ORDERED.

        s/ Nancy G. Edmunds
        Nancy G. Edmunds
        United States District Judge

Dated: September 27, 2023

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 27, 2023, by electronic and/or ordinary mail.

                        s/ Lisa Bartlett
                        Case Manager